UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CHARLES W. BURTON ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v.            ) | 3:03-cv-124 |
| ) | 3:97-cr-154 |
| ) | *Jarvis* |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| Respondent. ) | |

# MEMORANDUM OPINION

This is a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the § 2255 motion will be **DENIED** and this action will be **DISMISSED**. All other pending motions will be **DENIED** as **MOOT**.

I. Standard of Review

This court must vacate and set aside petitioner's conviction upon a finding that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255. To prevail under § 2255, petitioner "must show a 'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process."

*United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1968)).

Under Rule 8 of the Rules Governing Section 2255 Proceedings In The United States District Courts, the court is to determine after a review of the answer and the records of the case whether an evidentiary hearing is required. If the motion to vacate, the answer and the records of the case show conclusively that petitioner is not entitled to relief under § 2255, there is no need for an evidentiary hearing. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.     Factual Background

Petitioner and co-defendant, David E. Crozier, were charged, in a nine-count second superseding indictment, of the following: conspiracy to distribute and possess with intent to distribute various controlled substances (count one); armed robbery of a pharmacy (count two); using and carrying a firearm during and in relation to a crime of violence (count three); being a felon in possession of a firearm (count four referred to petitioner and count five referred to Crozier); possession with intent to distribute Schedule II controlled substances (count six); possession with intent to distribute a Schedule III controlled substance (count seven); possession with intent to distribute a Schedule IV controlled substance (count eight); and using and carrying a firearm during and in relation to a drug trafficking crime (count

nine). [Criminal Action No. 3:97-cr-154, Court File No. 71, Second Superseding Indictment].

Following a bench trial, petitioner was found guilty on all charges against him and was sentenced as a career offender to a term of imprisonment of 562 months. His conviction was affirmed on direct appeal. *United States v. Crozier*, 259 F.3d 503 (6th Cir. 2001), *cert. denied*, 534 U.S. 1149 (2002). The Sixth Circuit summarized the evidence against the defendants, with reference to discrete criminal activities, as follows:

> 1. The Tennessee Rite-Aid Robbery
>
> On November 26, 1995, two armed gunmen robbed the Rite-Aid Drug Store in Clinton, Tennessee, and absconded with numerous pharmaceutical drugs, including Schedule II, Schedule III, and Schedule IV controlled substances. During the robbery, one of the robbers (later identified as Burton) repeatedly asked Katrina DeBusk, the Rite-Aid pharmacist, about the location of several drugs, including Dilaudid pills and morphine. Several days after the robbery, DeBusk helped police prepare a composite sketch of the first suspect in about fifteen minutes. Police worked on a composite of the second suspect (again, later identified as Burton) for approximately three hours but failed to produce a sketch satisfactory to DeBusk.
>
> Approximately one month later, DeBusk and Shelly Simonds, the only other Rite-Aid employee present during the robbery, separately identified Burton as one of the robbers from a photographic line-up. The Clinton Police Department, which uses black-and-white mug shots, had obtained Burton's photograph from the Lexington, Kentucky, Police Department, which uses color mug shots. Accordingly, Burton's photograph was the only color photograph shown to the witnesses. On March 6, 1998, both witnesses again identified Burton as the perpetrator, this time from a live line-up. Burton was the only person represented in both the photo line-up and the live line-up.
>
> Although neither witness was able to identify Crozier as Burton's accomplice during the robbery, Crozier's brother-in-law, Richard Randolph, testified at trial that in early December, Crozier showed him a bag containing

bottles of pharmaceutical drugs and told him that Crozier and Burton had obtained the drugs by robbing a Tennessee drugstore.

### 2. The Kentucky Drug Sales

In late November or early December 1995, in Lexington, Kentucky, Clayton Hobbs arranged for Burton to sell some drugs to Christopher Tucker. Hobbs drove Burton and an unidentified third man in a small car to Tucker's shop where Burton sold Tucker two boxes of pharmaceutical drugs. Tucker gave Burton $1,800 in one-hundred dollar bills. Tucker was unable to identify Crozier as the third man.

The next day, as previously agreed, Burton and Hobbs returned to Tucker's shop, where Tucker gave Burton an additional one thousand dollars in one-hundred dollar bills. Tucker testified that this time, Burton and Hobbs were in a Cadillac Eldorado. On December 1, Burton paid six hundred dollars cash to a pawn shop for his previously-pawned Cadillac Eldorado. The United States thus argues that although Tucker could not recall the exact date of the drug sale, the drugs must have been sold on November 30, with the follow-up payment occurring on December 1.

### 3. Casing the Lexington, Kentucky, Rite-Aid

At approximately 4 p.m. on December 1, security personnel for the Rite-Aid Drug Store in Lexington observed Burton and Crozier enter the store together, walk around separately, and eventually meet up at the pharmacy. Burton made a purchase and left the store, only to return a short time later, stay awhile, then leave. Burton again returned and after fifteen or twenty minutes, met up with Crozier. The two split up again, ultimately leaving the store separately. A short while later, Burton again returned, and spent approximately five minutes paying particular attention to the cash registers' and employees' locations. Crozier also re-entered the store but remained near the front. Burton finally ended this episode by placing a Tylenol bottle in his pocket. When confronted by security, a fight ensued, resulting in Burton's arrest and Crozier fleeing the scene. Police found syringes, $1,557 in cash (including fifteen one-hundred dollar bills), and a number of Dilaudid pills on Burton. Shortly after Burton's arrest, his girlfriend pawned two handguns, one of which matched the description DeBusk had given of the gun she saw during the Tennessee Rite-Aid robbery.

On December 6, police officers executed a parole violation warrant on Burton. It was while Burton was being held on that charge that the Lexington Police Department forwarded Burton's color mug shot to the Clinton Police Department in Tennessee. Burton remained incarcerated for parole violations for the remaining time relevant to this appeal.

4. The Somerset, Kentucky, Drugstore Burglary

On February 8, 1996, Randolph and Crozier's son, Brett, burglarized a Somerset, Kentucky, drugstore and brought the drugs to Crozier. Some of those drugs were then taken to Clayton Hobbs, while Crozier, Randolph, and a man named Charlie Henderson sold the morphine obtained in the burglary to someone in Georgetown, Kentucky, for one thousand dollars.

During the time relevant to this appeal, Crozier was living on Limestone Street in Somerset, while Crozier's wife lived on White Street. Although Crozier often visited and occasionally stayed overnight at his wife's home, he maintained his own residence. On February 12, police officers executed search warrants at both the Limestone Street and White Street residences. The search of Crozier's Limestone Street residence revealed one bottle of pharmaceutical drugs and a ledger reflecting indebtedness to Crozier by Burton for one thousand dollars, and by "Clayton" for eight hundred dollars. The search of Crozier's wife's White Street residence revealed two bags containing a large number of pharmaceutical drugs in wholesale-sized bottles, and eight-hundred forty-five dollars in Crozier's wallet. Some of those bottles were traceable to the Somerset drugstore and others were consistent with drugs taken during the Tennessee Rite-Aid robbery. Although Crozier was present at the White Street address during the search, Crozier's fingerprints were not found on any of the seized booty.

*Id*. at 507-09.

In support of his § 2255 motion to vacate sentence, petitioner alleges numerous instances of ineffective assistance of counsel. He also alleges the cumulative effect of counsel's errors as a basis for relief.

III. Discussion

*A. Ineffective Assistance of Counsel*

In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The issue is whether counsel's performance "was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*). Because he is seeking relief under § 2255, petitioner bears the burden of proving by a preponderance of the evidence that his counsel was deficient. *See Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006). As noted, petitioner alleges several instances of ineffective assistance of counsel, each of which the court will consider in turn.

**1. Failure to object to violation of Interstate Agreement on Detainers.**

Although petitioner was originally brought to the Eastern District of Tennessee from the Kentucky prison where he was incarcerated pursuant to a writ of habeas corpus ad prosequendum, he was returned to Kentucky pending trial and the United States subsequently filed a detainer with the Kentucky prison. Petitioner was then brought back to this jurisdiction pursuant to a second writ of habeas corpus ad prosequendum. For that reason, the Interstate Agreement on Detainers (IAD), 18 U.S.C. App. 2, came into play. *See United States v. Mauro*, 436 U.S. 340, 349 (1978) ("[W]e hold that the United States is bound by the [Interstate Agreement on Detainers Act] when it activates its provisions by filing a detainer against a state prisoner and then obtains his custody by means of a writ of habeas corpus *ad prosequendum*.").

Approximately one week prior to trial, counsel for petitioner filed a motion to dismiss based upon the government's violation of the IAD. [Criminal Action No. 3:97-cr-154, Court

7

File No. 140]. In the supporting Memorandum, counsel argued that petitioner did not receive the requisite 30-day notice in order to contest the government's request for custody, as provided in 18 U.S.C. App. 2, Art. IV(a). [*Id.*, Court File No. 141]. The court denied the motion. [*Id.*, Court File No. 148, Minutes of motion hearing; Court File No. 221, Transcript of motion hearing, p. 32].

On direct appeal, petitioner again alleged his rights under the IAD had been violated and that his indictment should be dismissed. The basis of that argument was the speedy trial provision of the IAD. 18 U.S.C. App. 2, Art. IV(c). The Sixth Circuit first summarized when the United States is bound by the IAD and the relevant requirements of the Agreement:

> The Interstate Agreement is a compact entered into by forty-eight states, the United States, and the District of Columbia to establish procedures for resolution of one jurisdiction's outstanding charges against another jurisdiction's prisoner. A detainer "is simply a notice to prison authorities that charges are pending against an inmate elsewhere, requesting the custodian to notify the sender before releasing the inmate." The United States need not file a detainer in order to obtain custody over a state's prisoner. Thus, it is not necessarily bound by the Interstate Agreement on Detainers' requirements. If the United States chooses to file a detainer, however, the Agreement's requirements attach.
>
> Once the United States has filed a detainer with another jurisdiction and has made a written request for temporary custody of the defendant, Article IV of the Agreement imposes two significant requirements: (1) trial on the charges must commence within one hundred twenty days of the arrival of the prisoner into federal custody (the "speedy trial" provision); and (2) disposition of the pending charges must precede the return of the prisoner from federal to state custody (the "anti-shuttling" provision).

*United States v. Crozier*, 259 F.3d at 513 (quoting *Ridgeway v. United States*, 558 F.2d 357, 360 (6th Cir. 1977)) (other citations omitted).

Petitioner specifically argued on appeal that he was not tried within 120 days of the date of his arrival in this jurisdiction. The issue arose as a result of petitioner's motion to continue the trial date, which the court granted by written order only. The IAD specifically provides that "for good cause shown in open court, the prisoner or his counsel being present," a court "may grant any necessary or reasonable continuance" beyond the 120-day deadline. 18 U.S.C. App. 2, Art. IV(c).

The Sixth Circuit found that the district court violated the requirements of Article IV(c) "by failing to grant the continuance for good cause shown in open court, with either Burton or his attorney present." 259 F.3d at 514. Nevertheless, because petitioner did not object to the court's failure to literally comply with the requirements of Article IV(c) for obtaining a continuance, the Sixth Circuit reviewed his claim under a plain error analysis.

> To establish plain error, a defendant must show "(1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings."

*Id*. at 516 (quoting *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir.1998)).

The Sixth Circuit determined that petitioner had "shown both that an error occurred at the district court and that the error was clear and obvious, the first two prongs of the 'plain error' test." *Id*. The Court concluded, however, that petitioner "failed to show that the error also affected his substantial rights and that it seriously affected the fairness of the proceedings (prongs three and four of the 'plain error' test)." *Id*. Petitioner had argued that

he was not required to demonstrate prejudice as a result of the IAD violation, but the Sixth Circuit disagreed.

> Although we read the Agreement as mandating reversal when the district court fails to literally comply with Article IV(c)'s procedural requirements in response to the *government's* request for a continuance, we see nothing arbitrary about requiring a showing of prejudice when the speedy trial violation arose as a result of the *defense's* motion for a continuance.

*Id*.

Petitioner now alleges that his trial attorney's failure to object to the court's violation of the IAD and the attorney's failure to preserve the error for appellate review constituted ineffective assistance of counsel. Petitioner argues that the failure to object was a clear and obvious error. He further argues that had counsel properly objected to the IAD violation, the charges would have been dismissed by the trial court, or the issue at least preserved for appellate review and the charges then dismissed by the Sixth Circuit. In addition, petitioner also claims that, had he been informed in advance of the motion to continue, he would have objected to the continuance sought by his trial counsel.

Petitioner was originally represented by Elizabeth B. Ford, with the Federal Defender Services of Eastern Tennessee, Inc. With trial set for less than three months away, Ms. Ford was allowed to withdraw from representation and James A.H. Bell was appointed to represent petitioner. Mr. Bell is, and was at the time, a very competent, very well-respected criminal defense attorney.

This was a complicated case, involving complex expert testimony and eye witness identification. Mr. Bell moved to continue the trial date based upon his opinion that further

investigation was necessary to adequately prepare for trial and thus protect petitioner's right to the assistance of competent counsel. In addition, Mr. Bell was expecting the birth of his child between the date his motion was filed and the trial date. Given those circumstances and the fact that he would be absent from his office for several days, Mr. Bell again felt he would not have time to adequately prepare for trial.

The court granted the motion to continue, specifically finding the continuance necessary to protect petitioner's right to the assistance of competent counsel. [Criminal Action No. 3:97-cr-154, Court File No. 113, Order granting motion to continue, pp. 1-3]. The court also observed that there were key issues to be adjudicated before trial, namely procedural and substantive arguments regarding the *Daubert*[1] issues, and that the court would be hard-pressed to fully adjudicate the issues prior to the upcoming trial date. [*Id*. at 2].

Under the circumstances of this case, Mr. Bell rendered effective assistance of counsel by requesting a continuance of the trial date. In fact, it could be argued that it would have been error had Mr. Bell *not* sought a continuance. Mr. Bell clearly needed the additional time to adequately prepare for a complex trial. Having moved for additional time to prepare for trial, it would have been disingenuous for him to then move to dismiss as a result of the continuation of the trial date. Accordingly, the court finds that Mr. Bell's performance in this regard was not deficient.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In addition, petitioner cannot demonstrate that he was prejudiced by Mr. Bell's conduct. As noted, petitioner benefitted from the continuance of the trial date by allowing his attorney adequate time to prepare for trial in a complex and complicated case, undistracted by the impending birth of a child. As the Sixth Circuit found, petitioner's "substantial rights" were not violated, 259 F.3d at 516, nor was the "fairness of the proceedings" affected. *Id*. Petitioner has therefore failed to satisfy either prong of the standard set forth in *Strickland*.

**2. Failure to locate, interview, and present testimony of Albert Clayton Hobbs.**

Petitioner alleges his attorney failed to locate, interview, and present the testimony of Albert Clayton Hobbs. According to petitioner, Hobbs would have impeached an essential prosecution witness, specifically Chris Tucker.

Chris Tucker testified that he first met petitioner when Clayton Hobbs brought petitioner to Tucker's shop so that Tucker could purchase drugs from petitioner. [Criminal Action No. 1:97-cr-154, Court File No. 177, Transcript of Proceedings, pp. 175-77]. Tucker also testified that when he arrived at his shop, Hobbs and petitioner were sitting in Hobbs' car, mixing up dope in order to shoot it up. [*Id*. at 177-79]. Tucker further testified that he purchased narcotics from petitioner and that Hobbs drove petitioner back to the shop the next day to get the rest of the money owed him for the drugs. [*Id*. at 179-82]. Tucker finally testified that he was told by Hobbs that the narcotics he purchased came from a drug store robbery that petitioner had committed.

In support of his position, petitioner has now submitted Hobbs' affidavit, in which he testifies that he is a long-time acquaintance with petitioner and that at no time did he go with petitioner to the residence of Chris Tucker. Mr. Hobbs also denies going to Tucker's residence to sell drugs and denies making the statement about drugs coming from a drug store. According to Hobbs, he was not interviewed by petitioner's trial attorney, but had he been, he would have told counsel the foregoing. Hobbs also states that, during the trial of this case, he was incarcerated in the Fayette County, Kentucky, Detention Center, and would have testified truthfully if subpoenaed to testify at petitioner's trial. [Court File No. 2, Memorandum of Law in Support of Motion to Vacate Sentence, Appendix 4, Affidavit of Albert Clayton Hobbs].

Hobbs' value as a defense witness is questionable. Hobbs would not have been an alibi witness for petitioner, but rather a witness to impeach Tucker's testimony. As such, Hobbs would have been subject to impeachment himself. Hobbs' name ("Clayton") was on a ledger taken during the search of co-defendant Crozier's residence; the ledger showed "Clayton" owed Crozier $800. *United States v. Crozier*, 259 F.3d at 509. Crozier's brother-in-law, Richard Randolph, testified that Hobbs bought some of the drugs Randolph stole from the Somerset, Kentucky, drugstore. *Id*. In addition, Randolph corroborated Tucker's testimony that he was told the narcotics he purchased came from a drug store: Randolph testified at trial that Crozier had bragged to him about robbing a Tennessee pharmacy with petitioner. *Id*. at 508.

As Hobbs himself admits, he was in custody at the time of petitioner's trial. For that reason, and based upon the foregoing, Hobbs would not have made a very credible witness. Moreover, Hobbs' statement that he would have testified is also a questionable assertion. Based upon the testimony of other witnesses, Hobbs himself might have been charged in the drug conspiracy. Under the circumstances, it does not appear that the decision of petitioner's attorney to not pursue Clayton Hobbs as a witness was an unreasonable trial strategy. This claim of ineffective assistance of counsel lacks merit. *See United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (failure to present potential witnesses who are cumulative, or unreliable and subject to impeachment, does not constitute ineffective assistance of counsel).

**3. Failure to object to improper chain of custody for drug evidence.**

Petitioner alleges his attorney should have objected to the admission of the evidence seized at the White Street residence, which included drugs and non-drug material. He bases his challenge on the fact that Agent Chris Hacker testified that the drugs were seized on February 10, 1996, although the search warrants were not issued until February 12, 1996. Agent Hacker testified that, on February 12, 1996, he assisted in collecting evidence after the execution of three search warrants. [Criminal Action No. 1:97-cr-154, Court File No. 178, Transcript of Proceedings, pp. 169-71]. When asked about a certain bag with writing on it, which contained items taken from the White Street residence, Agent Hacker testified it was his writing and noted that the date of recovery was "2-10-96." [*Id.* at 173]. Petitioner claims the evidence was subject to suppression based upon this testimony.

Agent Hacker specifically testified, however, that he collected the evidence after the execution of the search warrant and petitioner's arrest. [*Id*. at 171]. In addition, Douglas Ralph Nelson, a detective with the Somerset Police Department, testified that he participated in the execution of three search warrants on February 12, 1996, including that of the White Street residence. [Criminal Action No. 1:97-cr-154, Court File No. 178, Transcript of Proceedings, pp. 137-38].

Agent Hacker's error, whether in his testimony or in his writing on the evidence bag, is not material. Accordingly, any motion to suppress the evidence seized at the White Street residence would have been frivolous. Petitioner has failed to state a claim of ineffective assistance of counsel in this regard. *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (failure of defense counsel to pursue frivolous motions and objections cannot constitute ineffective assistance of counsel).

**4. Failure to object to the admission of an altered videotape.**

Petitioner alleges his attorney failed to object to the admission of the surveillance videotape from the Kentucky Rite-Aid and failed to object to the prosecution's reliance on the videotape. Petitioner alleges the videotape should not have been admitted into evidence because it had been spliced for training purposes by Kentucky Rite-Aid security officers. The claim that the videotape was altered goes to the weight to be accorded the evidence, not to the admissibility of the evidence. Therefore, petitioner's attorney did not render ineffective assistance of counsel by failing to object to the admission of the videotape.

Based upon the foregoing, petitioner has failed to demonstrate ineffective assistance of counsel under the standard established by the Supreme Court in *Strickland*.

### B. Cumulative Errors

Petitioner alleges that he is entitled to relief based upon the cumulative effect of trial counsel's errors, which was sufficient to deny him a fundamentally fair trial. The Sixth Circuit has held that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness. *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).

This presupposes, of course, that there was error during the criminal proceedings. Since petitioner's allegations of error lack merit, a cumulative error analysis is not appropriate. *See Derden v. McNeel*, 978 F.2d 1453 (5th Cir.1992) (*en banc*). "[A]ny cumulative error theory must refer only to errors committed in the state trial court. A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors." *Id*. at 1458. *See also United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir.1990) ("cumulative-error analysis should evaluate only the effect of matter determined to be in error, not the cumulative effect of non-errors.").

IV. Conclusion

Petitioner is not entitled to relief under § 2255 and his motion to vacate, set aside or correct sentence will be **DENIED**. This action will be **DISMISSED**. In addition to the above, this court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Therefore, this court will **DENY** petitioner leave to proceed *in forma pauperis* on appeal. *See* Rule 24 of the Federal Rules of Appellate Procedure. Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253; Rule 22(b) of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE ORDER WILL ENTER.**

               s/ James H. Jarvis
               United States District Judge